IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KATHEM HASHEM, | ) | |
| | ) | |
| Plaintiff, | ) | 4:10CV3053 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | MEMORANDUM AND ORDER ON |
| Social Security, | ) | REVIEW OF THE FINAL DECISION OF |
| | ) | THE COMMISSIONER OF THE SOCIAL |
| Defendant. | ) | SECURITY ADMINISTRATION |
| | ) | |

Now before me is Plaintiff Kathem Hashem's complaint, ECF No. 1, which was filed on March 23, 2010. He seeks a review of the Commissioner of the Social Security Administration's decision to deny Hashem's application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. § 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Title XVI of the Act). The defendant has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 16-17.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., ECF No. 26; Def.'s Br., ECF No. 31.) I have carefully reviewed these materials, and I find that the Commissioner's decision must be affirmed.

## I.   BACKGROUND

On March 8, 2007, Hashem filed an application for SSI benefits. (Transcript of Social Security Proceedings (hereinafter "Tr.") at 115, ECF No. 17.) This application was denied on initial review, (id. at 69-72), and on reconsideration, (id. at 79-82). Hashem then requested a hearing before an ALJ. (Id. at 83.) The hearing was held on June 17, 2009, (e.g., id. at 19), and, in a decision dated July 28, 2009, the ALJ concluded that Hashem was not entitled to SSI benefits. (See id. at 5-18). Hashem requested that the Appeals Council of the Social Security Administration

1

review the ALJ's decision.  (See Tr. at 57.)  This request was denied, (see Tr. at 1-3), and therefore the ALJ's decision stands as the final decision of the Commissioner.

## II.   SUMMARY OF THE RECORD

On a Disability Report form, Hashem claimed that he became disabled on March 9, 2006, due to pain associated with "[b]ack problems" and "right leg problems." (Tr. at 153-54.)  Sometime later, Hashem completed a Disability Report - Appeal form, and on this form he indicated that he was also having "problems with depression due to [his] chronic pain." (Id. at 224-25.)  He was born in January 1972, (e.g., id. at 150); therefore, he was 34 years old on the alleged onset date.  He completed the ninth grade while living in Iraq, and although he has done some study, his ability to communicate in English (orally or in writing) is very limited.  (E.g., id. at 27-28.)[1]  He worked as a "mail inserter" at Metro Group until he suffered a back injury.  (Id. at 21, 279.)  After the injury, Metro Group employed him part-time as a security guard who watched employees swipe their badges while entering the building.  (Id. at 40-41.)

### A.   Medical Evidence[2]

On July 16, 2005, Hashem visited Memorial Hospital in Seward, Nebraska, with complaints of back pain.  (Tr. at 278-80.)  He reported that while he was at work, "he was bending over to pull out a drawer or a basket-like thing that weighs, perhaps, 30 pounds," and when "[h]e went to lift it . . . [he] got pain in his lower back." (Id. at 279.)  His physician noted that Hashem did not have any radicular pain into the lower extremities and was "in no apparent distress." (Id.)  The physician also noted, "He moves pretty well, twists some but then, when you ask him to do things, he tends to

---

[1] Hashem has been in the United States since 2002, and he became a United States citizen in January 2009. (Id. at 27.)

[2] This review of the medical evidence will focus on records dating back to approximately July 2005 and continuing to the date of the hearing before the ALJ.  It emphasizes the records cited by the parties in their briefs.

I note in passing that many of the records indicate that Hashem was assisted by an interpreter during his consultations with his doctors.  (See, e.g., Tr. at 279, 309, 368, 372, 373, 377.)

2

tighten up so my overall impression is that this doesn't hurt as bad as he indicates and that there may be some inconsistencies . . . ."  (Id.)  An examination revealed reduced range of motion, but no reduction of sensation in the lower extremities and "no tenderness to palpation of the back."  (Id.) The physician diagnosed a mechanical low back strain, filled out paperwork for Hashem's employer stating that Hashem was limited to sedentary duty for a week, prescribed medication, and advised Hashem "to keep moving, trying not to just lie around."  (Id.)

On August 19, 2005, Hashem underwent an MRI of the lumbosacral spine.  (Tr. at 295.)  The MRI revealed "[b]orderline grade 2 spondylolisthesis at L5 on S1 with bilateral L5 pars defects,"[3] "mild degenerative disk changes," and "some bilateral neural foramen narrowing at this level." (Tr. at 295.)

On September 7, 2005, Hashem visited Eric W. Pierson, M.D., at Neurological and Spinal Surgery, LLC, in Lincoln, Nebraska, pursuant to a referral from a Dr. Durand.  (Tr. at 372.)  Hashem reported increased pain in his back and pain extending down his right leg.  (Id.)  Following an exam, Dr. Pierson concluded that Hashem's symptoms were consistent with grade 2 spondylolisthesis, but he was not convinced that there was any L5 weakness.  (Id.)  He indicated that Hashem's "symptoms on exam are fairly dramatic," and that this might be "more due to pain than weakness."  (Id.)  He recommended a physiatry evaluation and injections "to see if symptoms can be controlled without surgery."  (Id.)

Hashem visited Phillip Essay, M.D., at Nebraska Pain Consultants on October 4, 2005.  (Tr. at 290.)  He reported "severe pain with a clicking sensation" focused more on the right side of the lower back, with posterior leg pain.  (Id.)  The pain was "worst when standing and walking, [and] also with lifting."  (Id.)  Dr. Essay noted that Hashem "had 4 weeks of physical therapy without much improvement," and that he was taking "Darvocet at night only."  (Id.)  An exam revealed "5+/5" muscle strength "with flexion/extension at the knees and ankles" and full range of motion in the thoracal lumbar spine.  (Id. at 291.)  There was also some pain with extreme flexion, and "moderate tenderness both to the right and left of midline at L5-S1" on palpation.  (Id.)  Dr. Essay

_____

[3] Spondylolishthesis refers to the "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum."  Stedman's Medical Dictionary 1813 (28th ed. 2006).

treated Hashem with a transforaminal epidural steroid injection and instructed him to follow up in two weeks.  (Id.)  A record dated October 25, 2005, indicates that Hashem "had no response whatsoever" to the injection, and Dr. Essay felt that there was no reason to repeat it.  (Id. at 288.)  Hashem was to seek an opinion from Dr. Pierson "in regards to whether surgical intervention would be appropriate."  (Id.)

On December 20, 2005, Hashem visited Geoffrey McCullen, M.D., who was a partner of Dr. Pierson's at Neurological and Spinal Surgery, LLC.  (Tr. at 368.)  Dr. McCullen noted that Hashem had ongoing right leg pain "despite activity modification . . . [and] pain medication."  (Id.)  He also noted that Hashem had been on light duty at work.  (Id.)  Dr. McCullen explained to Hashem that he could "continue to live with the problem with activity modification and periodic use of pain medication" or undergo "elective surgery," which could be performed using either an anterior or posterior approach.  (Id.)  He encouraged Hashem to think about his options, gave him a brochure to review, and invited him to return after he completed his review.  (Id.)

On February 1, 2006, Hashem reported to the emergency room at Bryan LGH Medical Center-East in Lincoln, Nebraska, with complaints of low back pain.  (Tr. at 373.)  The examiner noted that Hashem appeared "to be in no acute distress" and was "ambulating without difficulty."  (Id.)  There was "tenderness to palpation along the lumbar paravertebral muscular region on the right," but straight leg raising was negative, sensation was intact, and pedal pulses were intact.  (Id. at 374.)  Hashem was treated with an intramuscular injection and given "a note for no work for 24 hours."  (Id. at 374-375.)

Hashem visited Dr. Essay on February 13, 2006, and indicated that he preferred "long-term management of his pain by pharmacologic means" over surgery.  (Tr. at 286.)  Dr. Essay prescribed new pain medicine for Hashem.  (Id.)

On March 1, 2006, David Diamant, M.D., performed a workmen's compensation examination of Hashem.  (Tr. at 377-80.)  Hashem reported constant right low lumbar pain with intermittent leg pain, and he said that his pain was aggravated by "[l]ifting, bending, sitting beyond 20 minutes, standing beyond 20 minutes, sit to stand, rolling, [and] walking."  (Id. at 377-78.)  "Activity modification" and certain medications provided some pain relief.  (Id. at 378.)  Dr. Diamant's examination "reveal[ed] a man in no acute distress while seated."  (Id.)  Hashem's gait

4

was "slightly antalgic . . . during right-legged stance," and a "Gillet test show[ed] a blocked SI joint on the right." (Id.) Hashem also reported pain on forward flexion and extension, and during certain other portions of the examination. (Id. at 378-79.) Dr. Diamant explained to Hashem that his symptoms were quite possibly due to his spondylolisthesis and that "surgical management of this . . . generally is quite effective for good pain relief," but "Hashem indicate[d] that he [did] not want to pursue this route of treatment." (Id. at 379.) Dr. Diamant also explained the SI joint and lumbar facet joint as "potential pain generator[s]" and explained treatments for each, but Hashem said that he did not "want to consider further care for this condition," did not "want to consider diagnostic blocks," and did not "want to consider seeing a physical therapist with expertise in the management of SI joint dysfunction." (Id.) Dr. Diamant noted,

> Regarding physical capacities, it is my opinion that Mr. Hashem could likely work at a sedentary - light physical demand capacity. I do not foresee him tolerating a functional capacity evaluation based on his current level of pain, based on his current level of spinal pathology. I do not know the number of hours with which he can work. He is currently tolerating four hours per day. One may consider slowly titrating a number of hours per day upward to see if he tolerates this. One may also consider a functional capacity evaluation to see if such may shed some light on the number of hours per day he could work.

(Id.)

On March 14, 2006, Hashem visited Dr. Essay and reported "a moderate amount of overall improvement" with his new medicine. (Tr. at 283.) He understood that "surgery remain[ed] an option for him, but he continue[d] to refuse this." (Id.) A follow-up was scheduled in four to six months for a medicine review. (Id.)

Jake DeNell, P.T., O.C.S., of Lincoln Orthopedic Physical Therapy, PC, performed a functional capacity evaluation of Hashem on October 24, 2006. (Tr. at 381-85.) DeNell reported, "Overall test findings, in combination with clinical observations, indicate that Mr. Hashem displayed inconsistent and poor effort during the Functional Capacity Evaluation. He passed only 35% of the validity criteria, indicating very poor effort." (Id. at 381.) "His functional grip scores for hand gripping, palmar pinch and key pinch were all at the 1st percentile, indicating low scores despite no pathology to his hands, another indication of submaximal performance." (Id.) "It appeared that he would be able to lift more weight with the shoulder lift and the overhead lift and carry than he was

5

able." (Id.) DeNell also determined that Hashem had "a high amount of perceived disability." (Id.) He concluded that Hashem "could work in the sedentary/light category with a maximum lift of 15 lbs on an occasional basis" and "could lift 20 to 25 lbs occasionally with well positioned weights between his knee and shoulders in a safe manner and be classified in the light to light/medium category." (Id. at 382.) DeNell noted, however, that Hashem's "safe limits of lifting could be higher." (Id.) Also, DeNell determined that Hashem could sit for six to seven hours in an eight-hour workday, and he could sit for up to one hour at a time before getting up to relieve the pain associated with "static sitting." (Id.) Standing was limited to 30 or 40 consecutive minutes. (Id.)

On or about November 22, 2006, Dr. Diamant wrote to a Mr. Richard Endicott. (Tr. at 305-06.) Dr. Diamant's letter states,

> I did review the DVD that you had provided with regard to surveillance of Mr. Hashem.
>
> First of all, in reviewing the surveillance video, it appears that Mr. Hashem was monitored on June 21, 2006; July 10, 2006; and August 5, 2006. It showed him changing positions from stand to sit, sit to stand, walk, bending into a car, standing to squatting, squatting to standing, bending over, all without difficulty. It also showed him car transferring and walking without apparent difficulty.
>
> I reviewed the functional capacity evaluation as done at Lincoln Orthopedic Physical Therapy. It indicated that Mr. Hashem had difficulty squatting. Such is definitely not evident on the surveillance video. He showed no obvious balance difficulties during the surveillance video as he appeared to have during the FCE. He showed no difficulty bending during the surveillance video, through generally full range of motion. The FCE indicated that he could only go partial range of motion. As you know, the majority of the validity criteria were not fulfilled during the FCE. It was an invalid FCE.
>
> The clinical course of Mr. Hashem, coupled with his lack of improvement through time and medical interventions, coupled with his invalid FCE, coupled with what appears to be his ease of movements during the surveillance video that was obtained on several days over several months, makes me question the validity of his claims of pain. Although he does have obvious spinal pathology that existed prior to his date of injury, the aforementioned factors, based on my clinical experience and medical knowledge, lead me to significant reservation with regard to whether this individual is being forthright with his presentation.

> As such, in reference to my IME of March 1, 2006, I have reason to doubt that there is any functional impairment that should be rendered in this case. I have reason to doubt that there should be any reason for work restriction in reference to this case. I have reason to doubt that there is any permanent impairment in reference to this case.

(Id. at 305-06.)

Mr. DeNell also viewed the surveillance DVD, and in a letter to Mr. Endicott dated February 7, 2007, DeNell wrote,

> On multiple days [Hashem] is recorded walking, squatting, bending, and getting out of a car without difficulty. It's my opinion that the surveillance video further validates the inappropriate pain behaviors demonstrated and documented in my Functional Capacity Evaluation of 10/24/06.

> Furthermore, it's my opinion that the client does not have any restrictions, and should be able to return to work without restrictions based on the surveillance video. I concur with the opinions of Dr. Diamant on his letter of 11/22/06, that there should not be any functional impairment rendered in this case, and there should not be any reason for work restrictions in reference to this case.

(Id. at 386.)

On February 20, 2007, Hashem reported to Suzanne Vandenhul, M.D., of Antelope Creek Family Physicians, "for a second opinion on back pain." (Tr. at 401.) An examination revealed "tense, tender muscles in the lumbosacral region bilaterally," but Hashem's gait was appropriate. (Id.) Dr. Vandenhul wrote that Hashem "will be referred to Omaha for a second opinion if the orthopedic surgeon will agree to see him." (Id.) Hashem returned to Dr. Vandenhul on March 9, 2007, seeking "something to help with his pain." (Id. at 400.) Dr. Vandenhul noted that the process for obtaining an appointment with an orthopedic surgeon in Omaha was not yet completed. (Id.) She prescribed pain medication and advised Hashem to keep his appointment "when made." (Id.) On March 16, 2007, Dr. Vandenhul noted that the orthopedic surgeon in Omaha refused to take Hashem as a new patient after reviewing his records. (Id. at 399.)

On April 16, 2007, Rajesh Kumar, M.D., performed an examination of Hashem. (Tr. at 309-11.) Dr. Kumar noted that Hashem could "sit, stand or lie down without any problem." (Id. at 310.) There was tenderness in Hashem's lumbosacral area, and his spinal flexion was 50 degrees. (Id.) Lateral bending, extension of the spine, and rotation of the spine were painful. (Id. at 311.) Dr.

7

Kumar concluded that Hashem had "a problem with his lower lumbar spine," and opined that "[h]e would have difficulty bending, pulling, pushing, lifting, and squatting." (Id.)

On May 7, 2007, Hashem met with Dr. Pierson to review recent MRI and x-rays. (Tr. at 330.) Dr. Pierson noted that Hashem's spondylolisthesis appeared to be stable, but there did "seem to be some progression of central protrusion of the Lubmar 4-5 disc and perhaps a slight decrease in signal intensity consistent with progression of degeneration of the Lumbar 4 disc. (Id.) He suggested to Hashem that "a two level disc removal and fusion" would possibly be a surgical option, and he discussed the procedure's risks with Hashem. (Id.) A consultation with Dr. McCullen was to be arranged. (Id.)

Hashem visited Dr. McCullen on May 18, 2007, to discuss treatment options. (Tr. at 331.) According to Dr. McCullen, one option was "to continue to live with the problem as [Hashem] has been doing." (Id.) However, the pain would likely continue, and progressive degenerative change might cause his symptoms to worsen over time. (Id.) A second option was "another course of injection strategies," and a third option was elective surgery. (Id.) Dr. McCullen explained that, in his view, an L5-S1 fusion would be the best option, and he suggested that "in any case, [Hashem] would be best doing a low-impact job with less stress on the back, including bending, twisting, and lifting stress. (Id.) Hashem was "not sure what to do," and Dr. McCullen gave him "an option to come to rediscuss after he has had a chance to ponder the issues." (Id. at 332.)

On June 20, 2007, Hashem visited M.S. Kamal, M.D., a "Consulting Psychiatrist," on a referral from Katherine Zupancic, whom the record describes as Hashem's therapist. (Tr. at 390-91.) Hashem reported that he felt depressed and worried about his family and finances. (Id. at 390.) He said that he was not sleeping well, felt anxious, and chewed his nails (sometimes to the point of bleeding). (Id.) Dr. Kamal noted that there was "no history of any psychotic hospitalizations, medication or self harm behavior." (Id.) He diagnosed "[a]djustment disorder with mixed features of depression and anxiety, mild to moderate," and he prescribed medications for Hashem. (Id. at 391.) He also directed Hashem to continue to see his therapist. (Id.)

On July 1, 2007, Hashem visited Dr. Kamal for a follow-up. (Tr. at 389.) Hashem reported that his medication did not seem to make "much difference." (Id.) He also asked Dr. Kamal for "an exemption for the requirement from Health and Human Services to look for a 30 hour job," but Dr.

8

Kamal "explained to him that [he did] not feel that he qualifie[d] for that from a psychiatric point of view," and he advised Hashem to "go to his primary care physician or orthopedic doctor" for "an exemption for back pain." (Id.) Dr. Kamal made adjustments to Hashem's medication regimen, and he advised Hashem to "watch less news items and try to spend more time in other activities." (Id.)

Hashem followed-up with Dr. Kamal again on August 8, 2007, and reported that his sleep was improved, but he still felt depressed. (Tr. at 388.) Dr. Kamal made further adjustments to Hashem's medications and planned to follow up with Hashem in one month. (Id.)

It appears that Hashem followed-up with Dr. Kamal on September 6, 2007, though the transcript contains no record from that consultation. (See Tr. at 387.) On October 4, 2007, Hashem reported to Dr. Kamal that he did not "have many options now," did not "know what to do," was having difficulty finding a job, and felt "like his whole life has become disturbed because of his work- related accident and his present situation." (Id.) Dr. Kamal wrote, "Objectively . . . he is at his baseline and the plan at this time is to continue him on his present medications . . . ." (Id.)

On February 15, 2008, Hashem began therapy sessions with Teri Langan Dee, MA, LMHP, CPC. (Tr. at 434.) Dee referred Hashem to Pratap V. Pothuloori, M.D., who performed a mental status examination of Hashem on March 3, 2008. (Id. at 431.) Hashem told Dr. Pothuloori that he and his father were sent to prison in Iraq after he (Hashem) "participated in the uprising against Saddam Hussein" and failed to report to join the army. (Id.) Hashem was 17 years old at the time. (Id.) While in prison, Hashem was tortured, and his father was killed. (Id.) After his release, Hashem and his surviving family members escaped to Jordan. (Id.) While in Jordan, Hashem suffered from "nightmares, flashbacks, depression, anxiety, and sometimes anxiety attacks." (Id.) He said "he felt slightly better" after coming to the United States, but "he was treated extremely poorly" at his job, "and this brought back some of his past traumatic experiences." (Id.) He added that "after starting the job, his self esteem plunged down because he was not treated fairly." (Id.) Hashem reported that since quitting the job, "[h]e again started having problems with depression, lack of motivation, . . . feeling hopeless, worthless, and not sleeping very well at all." (Id.) In addition, he became socially isolated and withdrawn, his nightmares and flashbacks increased, and he began having "problems with anger and irritability." (Id. at 431-32.) Although he noted that Dr. Kamal had prescribed "medication to help him sleep and for his anxiety," he was currently "not

9

taking any medication at all." (Id. at 432.) Dr. Pothuloori noted that Hashem's mood was anxious, and he diagnosed "[d]epressive disorder – NOS," "[a]nxiety disorder — NOS," and "R/O Posttraumatic Stress disorder." (Id.) Dr. Pothuloori listed Hashem's GAF score as 55,[4] recommended that Hashem continue his therapy with Dee, and prescribed medication to be taken at bedtime. (Id. at 433.)

In a letter dated May 1, 2008, Dee wrote that Hashem had "attended weekly individual therapy sessions" since February 15, 2008. (Tr. at 435.) She wrote that Hashem's depression caused him to suffer the following symptoms "nearly every day: depressed mood most of the day, markedly diminished interest in activities, insomnia, fatigue, loss of energy, feelings of worthlessness, irritability, and diminished ability to concentrate." (Id.) She wrote that Hashem's anxiety caused him to suffer from the following symptoms "nearly every day: excessive anxiety and worry, difficulty controlling the worry, restlessness, fatigue, irritability, difficulty concentrating, and sleep disturbance." (Id.) She added that his "symptoms of PTSD include the following: client has witnessed traumatic events which currently cause distressed responses, difficulty falling and staying asleep, difficulty concentrating, irritability, detachment, hypervigilance, flashbacks, nightmares, etc." (Id.) She wrote that his symptoms increased after Hashem came to the United States, and that they increased again after he lost his job. (Id. at 435-36.) She also wrote that, in her opinion, Hashem "would have difficulties in performing competitive, full-time employment," has difficulty concentrating, has a limited "ability to respond appropriately to supervisors, co-workers, and work pressures," "may have difficulty with complex and detailed job instructions," and "generally does not respond favorably to pressure and stress." (Id. at 436.) In conclusion, she wrote that she had "seen limited gradual progress since the beginning of [Hashem's] therapy," and that he had "made slight improvements from week to week." (Id.)

On May 6, 2008, Hashem visited Dr. Vandenhul with concerns about allergies and back pain. (Tr. at 398.) He reported that "two specialist[s] . . . [have] given a different opinion on whether or

---

[4] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)).

not he is disabled," and "[h]e would like to file for disability but wants one more opinion before trying to do so." (Id.)  Dr. Vandenhul noted that Hashem was "in no acute distress," that he had "normal gait," and that he had "[n]o discomfort when climbing onto the exam table or getting off." (Id.)  She prescribed medicine for pain and allergies, and she indicated that she would "attempt to find an orthopedic surgeon who will agree to examine him." (Id.)

Hashem visited Dr. Vandenhul again on October 8, 2008. (Tr. at 397.)  Dr. Vandenhul noted that Hashem's back pain "had been under fair control" but had been worsening because Hashem was sitting for long periods while studying for his citizenship exam. (Id.)  He had not been "exercising or doing any physical therapy for" his back. (Id.)  An examination revealed tenderness in the lumbosacral region and a minimal decrease in range of motion. (Id.)  Dr. Vandenhul prescribed pain medication and provided Hashem with a pamphlet about caring for back pain. (Id.)

A progress note dated January 2, 2009, from Family Psychiatric Associates of Lincoln, P.C., indicates that several of Hashem's symptoms had shown moderate improvement. (Tr. at 425-26.) Hashem was instructed to continue taking his medication as directed, and no counseling was recommended. (Id. at 428.)  His GAF score was 70. (Id.)

On January 5, 2009, Hashem returned to Dr. Vandenhul for a follow-up. (Tr. at 395.) Hashem reported that his back was not any better and that he had run out of medicine. (Id.)  He refused to try physical therapy because it did not help him in the past, and he reported that he was "no longer doing the exercises that they recommended he do." (Id.)  He also indicated that he was not interested in surgery. (Id.)  On exam, Dr. Vandenhul observed tender muscles in the lower back and "some decreased range of motion." (Id.)  She indicated that Hashem's case would be referred "to Dr. Noble for further evaluation," and she "advised the patient that we cannot continue to do narcotics if he refuses to try to do anything to help this heal." (Id.)  She provided him with a prescription for Flexeril. (Id.)

A note dated January 16, 2009, indicates that Dr. Noble refused to take on Hashem as a patient. (Tr. at 395.)  On January 29, 2009, Hashem returned to Dr. Vandenhul "requesting more narcotics or a referral to someone who can treat him for his back pain." (Id. at 394.)  He declined an examination and claimed "that it is the same as it has always been." (Id.)  Dr. Vandenhul noted that she would "see if there is someone else that he can get into but it appears that there are no other

orthopedic surgeon[s] willing to treat him at this time, as he has not followed through with their recommendations."  (Id.)

In a letter dated June 2, 2009, Dee wrote, "I started seeing [Hashem] for individual therapy services on 2-15-08.  He attended regularly for the first two months. . . .  Since May of last year, I have only seen [Hashem] a few times sporadically over the year.  Due to lack of attendance, I do not have any current information regarding his condition."  (Tr. at 434.)[5]

## B.   Hashem's Testimony

During the hearing before the ALJ on June 17, 2009, Hashem testified that he was then 37 years old.  (Tr. at 26-27.)  He completed the ninth grade in Iraq, and after coming to the United States in 2002, he took classes to learn to speak and read English.  (Id. at 27.)  To become a citizen in January 2009, he completed a citizenship test.  The questions were translated into Arabic for him to study, and he memorized the answers and recited them in English.  (Id. at 27-28, 36-37.)  At Metro Group, he worked with others who spoke Arabic and were able to show him how to complete his work.  (Id. at 36.)  He testified that now that he is not working, he sometimes goes shopping with his family, and he sometimes reads the news in Arabic on a computer.  (Id. at 29.)  He walks for about an hour each day (though not continuously), does some lesser chores around the house, drives a car, and takes his children to the park.  (Id. at 29-30, 33.)  He said that he feels pain in his lower back when he sits for a long time, stands for more than twenty minutes, or walks for ten to fifteen minutes, and that the pain shoots down his right leg when he lifts 15-20 pounds.  (Id. at 31-34.)  He feels pain if he bends down to touch his knees.  (Id. at 33.)  He said that he was not currently taking pain medication or seeing a specialist for back treatment.  (Id. at 34.)    He also said that he could not return to his job at Metro Group because the job involves too much lifting.  (Tr. at 35.)

Hashem testified that he began seeing a psychiatrist and counselors because of "the injury [he] sustained at work and the way that they bothered [him]" there.  (Tr. at 37-38.)  He added that he spends extended periods of time by himself, feels sad, and worries.  (Id. at 38.)  He said that his medication makes him feel better.  (Id. at 39-40.)

---

[5] The transcript indicates that Hashem was seen in Dr. Pothuloori's office on "3/3/08, 4/21/08, 6/2/08, 7/1/08, 8/12/08, 9/8/08, 10/20/08, 11/18/08, 1/2/09, 2/2/09, 3/2/09, and 4/1/09." (Tr. at 406.)

## C.   The Vocational Expert's Testimony

During the hearing, the ALJ asked a Vocational Expert (VE), Stephen Kuhn, to consider a younger worker, illiterate in English, who has worked as an inserting machine operator and a surveillance system monitor, and who has the following RFC: he can occasionally lift or carry 20 pounds; he can frequently lift or carry 10 pounds; he can stand, sit, or walk for six hours in an eight-hour day; he can occasionally climb, balance, stoop, kneel, crouch, and crawl; he should avoid concentrated exposure to vibration, ladders, ropes, and scaffolds; and he has no restrictions using his hands.  (Tr. at 43-445.)  The ALJ then asked the VE whether, with this functional capacity, the person could go back to his past work as an inserting machine operator or surveillance system monitor.  (Id. at 45.)  The VE responded that "given this hypothetical, which would allow for light work," the person could perform both jobs.  (Id.)  The VE added that there were approximately 300 suitable insertion machine operator positions in Nebraska and approximately 50,000 positions in the nation.  (Id.)  The ALJ then asked,

> Now if I were to add on a mental that he could only do unskilled, SVP one or two work, work that was routine, repetitive, did not require extended concentration or attention or social interaction could be no more then [sic] occasional, not constant, intense and frequent.  Would that as a consideration, would it still be your opinion that he could do both jobs?

(Id.)  After asking for clarification of the question, the VE testified that the person would be able to work as a surveillance system monitor but could not perform the inserting machine operator job "due to the speed and attention he would need."  (Id. at 45-46.)  The VE added, however, that according to the Dictionary of Occupational Titles (DOT), the person could perform light work as a laundry worker, dishwasher/kitchen helper, or cleaner, or sedentary work as a surveillance system monitor.  (Id. at 46-47.)  The VE also testified that if Hashem's testimony were deemed to be credible, he would not be able to perform work in the national economy.  (Id. at 47-48.)

On cross-examination, Hashem's attorney reminded the VE that the ALJ's hypothetical included an assumption that the worker was illiterate in English, and the VE conceded that this fact would exclude the surveillance system job.  (Tr. at 48-49.)  Hashem's attorney then asked whether an illiterate person could satisfy the literacy requirements of the laundry worker, dishwasher, and cleaner jobs.  (Id. at 49.)  The following exchange then occurred:

13

A      The reasoning, reasoning, math and language for the laundry worker is reasoning is up to the 6th grade, math and language skills is between the 1st and 3rd grade level, which is as low as it goes. Kitchen helper is the same, reasoning level is up to the 6th grade, between the 4th and 6th grade level. Math and language skills are less than 3rd grade and the cleaner position, reasoning, math and language are all between the 1st and 3rd grade for all three components.

Q      This, do those limits infer that a person can read in English?

A      Those limits according to the DOT would, would have been evaluated based on their ability to read at that level, yes.

(Id.) The VE went on to testify that if the person is not able to read at the first grade level, the testimony was "in error." (Id. at 50.) He explained that a person who cannot read at the first to third grade level could not perform the jobs that he identified. (Id. at 52.)

The ALJ then asked the VE how Hashem was able to work as an inserting machine operator and surveillance system monitor while being illiterate. (Tr. at 52.) The VE replied that there appeared to be a discrepancy between Hashem's past work and the DOT, or perhaps Hashem's employer "did not require those particular level [sic] of skills." (Id. at 53.) The ALJ then asked the VE whether it was his opinion that, according to the DOT, "anybody who's an immigrant or didn't speak English could never work." (Id.) The VE responded negatively and explained that non-English speakers are shown how to perform the work so that they could "learn it based on demonstration and perform with very minimal communication." (Id. at 53-54.) The VE added that the insertion machine, laundry, dishwasher, and cleaner jobs are all jobs that could be demonstrated to a non-English speaker and learned within 30 days. (Id. at 54.)

### D.    The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether an individual claimant is disabled. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). In this case, the ALJ found Hashem to be not disabled at step five. (See Tr. at 17-18.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). If the

14

claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). In the instant case, the ALJ found that Hashem "has not engaged in substantial gainful activity since February 23, 2007, the application date." (Tr. at 10 (citation omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c); id. § 416.920(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities and satisfies the "duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909. Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); id. § 416.921(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c). Here, the ALJ found that Hashem "has the following severe impairments: degenerative disc disease of the lumbar spine with right leg radicular pain, depression, anxiety, and post-traumatic stress disorder." (Tr. at 10 (citation omitted).)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1. If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). In this case the ALJ found that Hashem "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. at 10.)

15

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[6] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work."  See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); id. § 416.920(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. § 416.920(a)(4)(iv), (f).  The ALJ concluded that Hashem "has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; stand, sit, and walk 6 hours in an 8-hour day; and occasionally perform postural activities of climbing, balancing, stooping, kneeling, crouching, and crawling."  (Tr. at 11-12.)  She added, "He should avoid ladders, ropes, scaffolds, and concentrated exposure to vibration.  He has no restriction in the use of his hands.  Due to his mental impairments, the claimant is limited to routine, repetitive, unskilled work which does not require extended concentration or attention and no more than occasional social interaction."  (Id. at 12.)  She also determined that, given this RFC, Hashem "is not capable of performing past relevant work as a surveillance system monitor and inserting machine operator."  (Id. at 17.)

Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past.  See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g).[7]  If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five.  See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g).  Here, however, the ALJ found that Hashem "is capable of performing a wide range of unskilled work in the national economy."  (Tr. at 17.)  She noted that he "would be able to perform the requirements of representative unskilled light occupations such as laundry worker . . . , dishwasher/kitchen helper . . . , and cleaner . . . ."  (Id.)  On the question of Hashem's illiteracy, the ALJ wrote,

---

[6] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments."  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).  See also 20 C.F.R. § 416.945(a).

[7] "Through step four of this analysis, the claimant has the burden of showing that she is disabled."  Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  After the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform."  Id.

16

Regarding [Hashem's attorney's] review of the regulations on illiteracy and the inability to communicate in English, see 20 CFR 416.964, the argument that an immigrant cannot perform any work due to limited English skills is contrary to Mr. Kuhn's experience as a vocational expert.  Pursuant to SSR 00-4p, Mr. Kuhn explained that although the information contained in the Dictionary of Occupational Titles contemplates reasoning, math, and language skills which require literacy in the English language, it is his experience as a vocational expert that the unskilled jobs he listed, including surveillance system monitor, can be learned by demonstration within 30 days.  Mr. Kuhn also stated that the claimant has shown the ability to successfully perform work at the SVP 2 level in his positions as an inserting machine operator and surveillance system monitor despite his limited ability to communicate in English.  To argue that a person who does not speak or read English would be precluded from all work by virtue of a governmental regulation borders on the absurd and would be a discriminatory application.

(Id. (citation omitted).)


### III.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings."  Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

17

I must also determine whether the Commissioner's decision "is based on legal error." Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

### IV.   ANALYSIS

Hashem argues that the Commissioner's decision must be reversed because 1) the ALJ failed to follow the applicable guidelines when discrediting Hashem's subjective complaints; 2) the ALJ's questions to the Vocational Expert were flawed; and 3) the ALJ's finding at step five of the sequential analysis was erroneous.  (Pl..'s Br. at 7-11, ECF No. 26.)  Each of Hashem's arguments will be analyzed in turn.

#### A.   Credibility

Hashem claims, without elaboration, "that the ALJ's analysis and determination as to credibility did not follow the guidelines set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), nor the codification of these rules found in SSR 96-4p and SSR 96-7p, and, therefore, the ALJ['s] determination as to credibility is not supported by substantial evidence."  (Pl.'s Br. at 7.)

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)).  "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the participating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints."  Id. (citation omitted) (alteration in original).  "The ALJ need not explicitly discuss each factor, however."  Id. (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).  "It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints."  Id. (quoting Goff, 421 F.3d at 791) (alteration in original).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so," courts "will normally defer to the ALJ's

credibility determination." Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)).

After noting that she had carefully considered the evidence in accordance with Polaski, the ALJ concluded that Hashem's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment." (Tr. at 16.) The ALJ then specified the following reasons for discrediting the plaintiff's testimony: 1) the medical evidence does not include limitations beyond those included in the RFC assessment; 2) objective medical evidence did not show that Hashem could not perform any work; 3) Hashem indicated that his pain was well-managed with medication; 4) Hashem refused surgery and physical therapy; 5) Dr. Kamal did not believe that Hashem's mental condition would qualify him for a work exemption; 6) Hashem stopped attending therapy sessions with Dee after two months;[8] 7) surveillance video showed Hashem moving without difficulty, causing Dr. Diamant and Mr. DeNell to doubt whether Hashem had any functional limitations; 8) Hashem gave poor effort during his functional capacity evaluation; 9) Hashem sat for long periods studying for his citizenship exam, despite claims that he could only sit for a relatively short time; 10) Hashem's claims of illiteracy in English were inconsistent with other evidence in the record; and 11) Hashem's daily activities have been affected only minimally. (Tr. at 16.) The reasons cited by the ALJ either correspond to Polaski factors, see, e.g., Moore, 572 F.3d at 524 (indicating that the ALJ must consider, inter alia, the claimant's daily activities, the duration, intensity, and frequency of pain, the effectiveness of medication, functional restrictions, and the absence of objective medical evidence), or have been identified by the Eighth Circuit as appropriate considerations in an ALJ's credibility determination, see, e.g., Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011) (indicating that when analyzing credibility, the ALJ properly considered the fact that the RFC determination was consistent with treating physicians' determinations); id. (noting that an "ALJ may discredit a claimant based on inconsistencies in the evidence"); Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's

---

[8] It should be noted that the record does not state that Hashem stopped attending therapy completely; rather, Dee indicated that Hashem's attendance became sporadic, and she had no "current information regarding his condition" by June 2, 2009. (See Tr. at 434.)

credibility."); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (indicating that the ALJ properly considered the claimant's conservative treatment when discrediting her complaints of pain); Brown v. Chater, 87 F.3d 963, 965-66 (8th Cir. 1996) (noting that the ALJ's credibility analysis properly incorporated evidence showing that the claimant put forth inconsistent effort on tests, that the claimant exaggerated problems, and that the claimant's physicians did not put significant restrictions on her).   I find that the ALJ gave good reasons for discrediting Hashem's testimony, and her credibility determination is entitled to deference.

### B.    The Questions Put to the Vocational Expert

Hashem argues next that the ALJ's first question to the VE was "flawed" because "[i]t does not include any information as to the claimant's medical problems or diagnoses," and because it "includes the job of [s]urveillance system monitor as past relevant work when this job was only part time." (Pl.'s Br. at 8.)

I must reject Hashem's first criticism of the question because "the hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the 'concrete consequences' of those impairments." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006).  Standing alone, the fact that the question did not include information about Hashem's diagnoses or descriptions of his "medical problems" does not amount to error.

Hashem's second criticism is on somewhat stronger footing.  The defendant seems to concede that Hashem's work as a surveillance system monitor does not amount to past relevant work because it was not substantial gainful activity.  (See Def.'s Br. at 18, ECF No. 31.)  See also Moad v. Massanari, 260 F.3d 887, 891 (8th Cir. 2001)("A job is past relevant work if it was 'done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity.'" (quoting 20 C.F.R. § 404.1565(a))).  The ALJ did consider Hashem's surveillance system monitor position to be past relevant work, (see Tr. at 17), and I shall assume for the purposes of analysis that it was error for her to do so.  The ALJ found, however, that Hashem was "not capable of performing past relevant work as a surveillance system monitor."  (Id.)  Because the ALJ did not make a finding of "no disability" at step four of the sequential analysis, the ALJ's error had no effect on the decision.  Cf. Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) (concluding that an ALJ's error was

20

harmless because there was "no indication that the ALJ would have decided differently" in the absence of his error).[9]

## C.    The ALJ's Step Five Finding

Hashem argues that the ALJ "never fully resolved" questions about Hashem's ability to work given his illiteracy.  (Pl.'s Br. at 10.)  He submits that the ALJ's "hypothetical questions did not address the issue of how many jobs exist in the regional and national economy where the claimant could be trained and work with people who spoke Arabic," and he adds that the ALJ did not identify the "number and . . . types of jobs the claimant could be taught solely by demonstration, where someone not speaking Arabic would not be required to be present for the daily job duties."  (Id. at 10-11.)  He also claims that the ALJ should have explored whether "there were any safety matters involved if the claimant were unable to communicate in English on the job site with the other workers, supervisors, etc."  (Id. at 11.)

The plaintiff's arguments raise complex questions about the relationship between English literacy, disability, and employability, but it seems to me that these questions were addressed adequately during the hearing.  The ALJ identified a conflict between the DOT–which includes literacy requirements that would preclude work for persons who do not speak English–and the VE's testimony that non-English speakers work in the national economy by taking unskilled jobs that they can learn "based on demonstration" and can "perform with very minimal communication."  (Tr. at

---

[9] I note in passing that the ALJ indicated that she also considered the surveillance system monitor job to be "a step 5 (other work) job."  (Tr. at 17.)  It is not clear, however, whether the ALJ found that the job amounted to work that falls within Hashem's RFC given his age, education, and work experience.  (See id.)  The plaintiff does not appear to take issue with the ALJ's decision to consider the job as "other work," except insofar as it seems to show that the ALJ erred in identifying the surveillance system monitor position as "past relevant work."  (See Pl.'s Br. at 8.)  I conclude that the ALJ's opinion is arguably deficient due to its ambiguity on this point, but I do not see that this deficiency had any impact on the outcome of the decision.  See Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) (explaining that an arguable deficiency in opinion-writing technique does not require a reversal if the deficiency had no bearing on the outcome).  The ALJ found at step five that Hashem was capable of performing a wide range of unskilled work–including, for example, jobs as a laundry worker, dishwasher or kitchen helper, and cleaner, and reversal is not warranted merely because it is unclear whether the job of surveillance system monitor represents a fourth example of an occupation that Hashem is capable of performing.

54.)  The VE explained that although the DOT appeared to preclude Hashem from holding all of the jobs identified by the VE, persons who cannot communicate in English could perform those particular jobs because the jobs could be learned within 30 days through demonstration.  (Id.)  The ALJ resolved the apparent conflict between the VE's opinion and the DOT by determining that the VE's opinion was reasonable and that the alternative "borders on the absurd and would be a discriminatory application."  (Id. at 17.)  This was appropriate.  See Social Security Ruling 00-4p, 2000 WL 1898704, at *2 (December 4, 2000) (explaining that the ALJ must resolve the conflict between the DOT and the VE's testimony "by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information").  See also Charles v. Astrue, 291 F. App'x 552, 555 (5th Cir. 2008) ("Although a conflict existed between the vocational expert and the Dictionary of Occupational Titles ("DOT") with respect to the ability of a person functionally illiterate in English to perform the types of jobs identified by the vocational expert, the ALJ explained that he did not rely on the DOT because the argument that illiteracy in English precluded employment, taken to its logical conclusion, would mean that 'virtually all immigrants would be automatically entitled to disability benefits.'  Rather, as the vocational expert testified, and the regulations suggest, see 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00(i), persons who are functionally illiterate in English can still perform a significant number of unskilled jobs in the national economy, including the ones identified by the vocational expert.").

While it is true that neither the ALJ nor Hashem's representative asked the VE to testify about the availability of Arabic translators in the workforce or "safety matters" that might arise due to Hashem's inability to communicate in English, I am not persuaded that the record was inadequately developed on the issue of Hashem's ability to work.  The existence of work is established "when there is a significant number of jobs (in one or more occupations) having requirements that [the claimant is] able to meet with [his] physical or mental abilities and vocational qualifications."  20 C.F.R. §§ 404.1566(b), 416.966(b).  The record is fully developed on this point, and the ALJ's finding that Hashem "is capable of performing a wide range of unskilled work in the national economy," (Tr. at 17), is supported by substantial evidence.

**IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated June 27, 2011.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge